2018 IL App (3d) 170649

Opinion filed September 17, 2018

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2018

| | | |
|---|---|---|
| LLOYD BELL and REBECCA BELL, | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| Plaintiffs-Appellees, | ) | Tazewell County, Illinois. |
| | ) | |
| v. | ) | |
| | ) | Appeal No. 3-17-0649 |
| RALPH RING, d/b/a Patton-Ring Truck, | ) | Circuit No. 17-SC-376 |
| Trailer & Engine Specialists, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Richard D. McCoy, |
| | ) | Judge, presiding. |

PRESIDING JUSTICE CARTER delivered the judgment of the court, with opinion.
Justice Lytton concurred in the judgment and opinion.
Justice Holdridge dissented, with opinion.

**OPINION**

¶ 1    Plaintiffs, Lloyd and Rebecca Bell, filed a small claims case against defendant, Ralph

Ring, d/b/a Patton-Ring Truck, Trailer & Engine Specialists, for violations of the Automotive

Repair Act (Repair Act) (815 ILCS 306/15 (West 2016)) and the Consumer Fraud and Deceptive

Business Practices Act (Consumer Fraud Act) (815 ILCS 505/2Z (West 2016)) in connection

with defendant's repair of plaintiffs' semitruck (truck). Plaintiffs sought the return of the truck,

damages, and other relief. After a bench trial, the trial court ruled in plaintiffs' favor; granted

plaintiffs possession of the truck; and awarded plaintiffs damages, costs, and attorney fees. Defendant appeals. We affirm the trial court's judgment.

¶ 2                                            FACTS

¶ 3        Plaintiff, Lloyd Bell, owned and operated a 2007 Freightliner semitruck and was a truck driver for Cedar Rapids Steel Transport (Cedar Rapids).[1] Lloyd had worked for Cedar Rapids as an owner-operator for the past 23 years. Defendant, Ralph Ring, was the owner and operator of Patton-Ring Truck, Trailer & Engine Specialists (Patton-Ring). Patton-Ring was a commercial truck and trailer repair facility that performed repair work on heavy trucks and equipment, trailers, and motor coaches.

¶ 4        On January 3, 2017, Lloyd's truck broke down. Soon thereafter, Lloyd contacted Truck Centers, Inc. (Truck Centers), a repair shop in Morton, Illinois, and obtained an estimate of approximately $3300 for the cost of repairs, not including the cost of towing the truck to the repair shop. Lloyd then contacted defendant in an effort to obtain an estimate for the repair work and to see if defendant could match the estimate Lloyd had received from Truck Centers. Defendant had previously conducted repairs on Lloyd's truck for Cedar Rapids and routinely did work on Cedar Rapids' semitrucks. Defendant initially refused to repair Lloyd's truck because defendant was too busy with other repairs and did not have time to give Lloyd an estimate, and defendant told Lloyd as much. Lloyd persisted in trying to have defendant perform the repairs because of defendant's experience and reputation in repairing those types of trucks. Defendant eventually agreed to have Lloyd's truck towed from Chicago to defendant's shop in East Peoria so that he could determine what needed to be repaired.

_____

[1]It is unclear from the record whether Lloyd's wife, Rebecca Bell, was a co-owner of the truck.

¶ 5    Shortly after Lloyd's truck arrived at defendant's shop, defendant conducted a preventative maintenance checklist inspection on the truck. At the bench trial in the instant case, the parties disagreed as to what happened next. Lloyd testified that he contacted defendant and defendant's wife, who performed the administrative functions for Patton-Ring, numerous times over the next month trying to obtain an estimate from defendant on how much the repair work would cost. According to Lloyd, he never gave defendant permission to go forward with the work because he needed to get a loan to pay for the repairs and was waiting for defendant to give him an estimate of the cost. Lloyd testified further that on February 10, 2017, he and his wife, Rebecca, went to defendant's shop to check on the status of the truck, only to learn that defendant had already completed the repairs. At that time, plaintiffs requested an invoice for the work, and defendant presented them with a handwritten invoice listing the total cost for labor and materials as approximately $9000, which plaintiffs refused to pay. Defendant later provided plaintiffs with a typewritten invoice and reduced the cost of the repairs to approximately $8600, which plaintiffs refused to pay as well. Because plaintiffs refused to pay for the work, defendant refused to return the truck to them. As a result, Lloyd had to rent a truck so that he could continue in his work for Cedar Rapids. Lloyd confirmed during his testimony that he did not have any type of ongoing maintenance or repair contract with defendant whereby defendant would be the person who would fix plaintiffs' truck whenever it broke down.

¶ 6    Defendant, on the other hand, testified that Lloyd came to his shop shortly after the truck was towed to that location. Defendant went over the preventative maintenance checklist inspection with Lloyd and showed Lloyd everything that needed to be repaired on the truck. Lloyd was in a hurry to get the truck repaired, instructed defendant to go forward with the repairs, and told defendant that he wanted to make sure that his truck was not going to break

3

down again. In their discussions, defendant had told Lloyd that he could match or beat Truck Centers' estimate as to the same repairs and had also told Lloyd that many more repairs were needed. Defendant maintained that Lloyd had instructed him to go forward with the work, even though defendant had told Lloyd that he was too busy to give Lloyd an estimate for the total cost of the repairs. Defendant confirmed in his testimony that he did not provide Lloyd with a written or oral estimate and that he did not have Lloyd sign a written waiver of an estimate for the work. According to defendant, the majority of his customers were businesses or people who owned their equipment to run a business and it was not his practice to give his customers, including Cedar Rapids, estimates before starting repair work. Defendant stated further that it was also not the practice of other truck repair shops to provide estimates to their customers before starting repair work. Defendant commented that he later reduced Lloyd's bill because he was trying to maintain a good working relationship with Lloyd. Defendant also confirmed that he had worked on that particular truck before but stated that the work was done for, and billed to, Cedar Rapids. Defendant's wife also testified and confirmed that she and defendant had told Lloyd that defendant would not be able to give him an estimate for the repairs and that Lloyd persisted with having defendant repair the truck, despite being told that an estimate would not be provided.

¶ 7        In April 2017, plaintiffs filed the instant small claims case against defendant. In the complaint, plaintiffs alleged that defendant violated the Repair Act and the Consumer Fraud Act by not providing a written estimate of the work that was to be completed and by not obtaining prior authorization from plaintiffs for that work. Plaintiffs sought the return of the truck, damages, and other relief.

¶ 8        Over two days in June and July 2017, a bench trial was held on plaintiffs' complaint. Three witnesses were called to testify: Lloyd, defendant, and defendant's wife. In addition,

4

several exhibits were presented, including the estimate that plaintiffs had received from Truck Centers, the handwritten invoice that plaintiffs had received from defendant, the typewritten invoice that plaintiffs had received from defendant, the truck rental lease that Lloyd had entered into, and the preventative maintenance checklist inspection form that defendant had prepared. After all of the evidence had been presented and the closing arguments had been made, the trial court took the case under advisement.[2] The trial court later issued a written decision, ruling in plaintiffs' favor; granting plaintiffs possession of the truck; and awarding plaintiffs damages, costs, and attorney fees. Following the denial of defendant's motion to reconsider, defendant appealed.

¶ 9                                          ANALYSIS

¶ 10          On appeal, defendant argues that the trial court erred in ruling in plaintiffs' favor after the bench trial on plaintiffs' complaint for violations of the Repair Act and the Consumer Fraud Act in connection with defendant's work on Lloyd's truck. In support of that argument, defendant makes three different assertions. First, defendant asserts that the Repair Act did not apply in this case and that defendant, therefore, was not required to provide Lloyd with a written estimate or to obtain prior authorization for all of the work performed because defendant's work on Lloyd's truck fell under one or more of the exceptions to the Repair Act. Specifically and citing his own reading of the statute, defendant contends that his work on Lloyd's truck fell under the commercial fleet exception, the ongoing services exception, and the maintenance transactions exception to the statute. Second, and in the alternative, defendant asserts that even if the Repair Act applied, he was not required to provide Lloyd with a written estimate because Lloyd waived

_____

[2]In closing arguments, defendant's attorney told the court that defendant was asserting a counterclaim for the total cost of the repairs that defendant performed. It does not appear from the record, however, that defendant filed a written counterclaim.

5

the estimate requirement by his conduct. In making that assertion, defendant points out that the Repair Act allows for waivers of the estimate requirement (see 815 ILCS 306/45 (West 2016)) and claims that Lloyd's conduct of insisting that defendant perform the work after being informed that defendant did not have time to provide Lloyd with an estimate constituted a valid waiver of the estimate requirement. Third and also in the alternative, defendant asserts that even if the Repair Act applied and even if Lloyd did not waive the estimate requirement, plaintiffs were still not entitled to damages under the Consumer Fraud Act because plaintiffs failed to prove that defendant knowingly violated the Repair Act, as required for a Consumer Fraud Act violation. In making that assertion, defendant cites to some of the case law on this issue, but in different contexts, and claims that to establish an unlawful practice under the Consumer Fraud Act based upon a knowing violation of the Repair Act, the plaintiffs must show that the defendant knew about the Repair Act's requirements and intended to violate them. See, *e.g.*, *Kunkel v. P.K. Dependable Construction, LLC*, 387 Ill. App. 3d 1153, 1159-60 (2009) (finding that the plaintiffs failed to prove the "knowing" requirement under section 2Z of the Consumer Fraud Act relating to roof repair work because the plaintiffs failed to present either evidence of the defendants' state of mind in failing to provide the plaintiffs with a required consumer rights pamphlet or evidence supporting a knowing violation, even though the plaintiffs testified that defendants did not provide them with the required pamphlet); *Wendorf v. Landers*, 755 F. Supp. 2d 972, 978 (N.D. Ill. 2010) (finding that plaintiffs failed to allege sufficient facts to establish the "knowing" requirement under section 2Z of the Consumer Fraud Act relating to automatic gym membership payments because the plaintiffs did not allege directly or by inference that the defendant intentionally violated the underlying statute). For all the reasons stated, defendant asks

6

that we reverse the trial court's ruling, that we enter judgment in defendant's favor, and that we award defendant approximately $9000 in damages.

¶ 11 Plaintiffs argue that the trial court's ruling was proper and should be upheld. Responding to each of defendant's assertions in turn, plaintiffs contend first, although somewhat implicitly, that the trial court correctly found that defendant violated the Repair Act by failing to give Lloyd an estimate before performing the work on Lloyd's truck. In support of that contention, plaintiffs assert that defendant's work on Lloyd's truck did not fall within one of the exceptions to the Repair Act and that defendant's claim to the contrary goes against the plain and unambiguous language of the statute. Second, plaintiffs contend that there was no waiver of the Repair Act's estimate requirement in the present case. In making that contention, plaintiffs note that defendant presented no evidence at trial to establish that Lloyd had signed a written waiver of the estimate requirement as mandated by section 20 of the Repair Act (815 ILCS 306/20 (West 2016)) and claim that to allow a constructive waiver of the estimate requirement, as defendant suggests, would defeat the effect of section 20. Third and finally, plaintiffs contend that the trial court correctly found that defendant acted knowingly and that the defendant violated the Consumer Fraud Act. Plaintiffs claim that defendant's assertion to the contrary misconstrues the "knowing" requirement under the Consumer Fraud Act and ignores the longstanding legal principle that ignorance or mistake of law is no defense to a violation of the law. In support of their claim, plaintiffs point to case law interpreting the "knowing" requirement under other consumer-fraud-type statutes and maintain that defendant's acts here were intentional and were not the result of a mistake about material facts relating to the estimate requirement. See, *e.g.*, *Baker v. G.C. Services Corp.*, 677 F.2d 775, 779 (9th Cir. 1982) (stating that the evidence, which, at best, showed that the appellant had been mistaken about the law was insufficient to support the

7

*bona fide* error defense under the Fair Debt Collection Practices Act (15 U.S.C. § 1692k(c) (1982)); *Rutyna v. Collection Accounts Terminal, Inc.*, 478 F. Supp. 980, 982 (N.D. Ill. 1979) (stating that the *bona fide* error defense under the Fair Debt Collection Practices Act did not immunize mistakes of law and was designed to protect those defendants who tried to prevent the prohibited conduct but failed to do so, even though they maintained procedures reasonably adapted to avoid those errors); *Turner v. J.V.D.B. & Associates, Inc.*, 211 F. Supp. 2d 1108, 1109 (N.D. Ill. 2002) (stating in a case under the Fair Debt Collection Practices Act that a mistake of fact may constitute a defense, but a mistake of law is never a defense), *rev'd on other grounds*, 330 F.3d 991, 995-96 (7th Cir. 2003). For all of the reasons set forth, plaintiffs ask that we affirm the trial court's judgment.

¶ 12 In ruling upon this appeal, we are called upon to perform two different tasks. First, we are asked to perform statutory interpretation of various provisions of the Repair Act and the Consumer Fraud Act. In performing that task, which is a question of law, we will apply a *de novo* standard of review. See *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 50. Second, we are asked to review the findings made by the trial court after a bench trial. In performing that task, we will apply a manifest weight standard of review and will not reverse the trial court's findings unless they are against the manifest weight of the evidence. See *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002); *Meyers v. Woods*, 374 Ill. App. 3d 440, 449 (2007). A finding is against the manifest weight of the evidence only if it is clearly apparent from the record that the trial court should have reached the opposite conclusion or if the finding itself is unreasonable, arbitrary, or not based upon the evidence presented. *Best v. Best*, 223 Ill. 2d 342, 350 (2006). Under the manifest weight standard, deference is given to the trial court as finder of fact because the trial court is in a better position than the reviewing

court to observe the conduct and demeanor of the parties and witnesses. *Id.* A court of review, therefore, will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given evidence, or the inferences to be drawn. *Id.* at 350-51.

¶ 13        The principles of statutory construction are well established. The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature. *Gaffney*, 2012 IL 110012, ¶ 56. The most reliable indicator of that intent is the language of the statute itself. *Id.* In determining the plain meaning of statutory terms, a court should consider the statute in its entirety and keep in mind the subject the statute addresses and the apparent intent of the legislature in enacting the statute. *Blum v. Koster*, 235 Ill. 2d 21, 29 (2009); 5 ILCS 70/1.01 (West 2016) (in construing a statute, "[a]ll general provisions, terms, phrases and expressions shall be liberally construed in order that the true intent and meaning of the General Assembly may be fully carried out"). If the statutory language is clear and unambiguous, it must be applied as written, without resorting to further aids of statutory construction. *Gaffney*, 2012 IL 110012, ¶ 56. A court may not depart from the plain language of the statute and read into it exceptions, limitations, or conditions that are not consistent with the express legislative intent. *Id.*

¶ 14        One of the obvious purposes of the Repair Act is to protect customers. See 815 ILCS 306/5 (West 2016); *Jandeska v. Prairie International Trucks, Inc.*, 383 Ill. App. 3d 396, 400 (2008). Section 15 of the Repair Act requires a motor vehicle repair facility that is covered by the Act to provide a consumer with a written estimate (or written price limit) of the work to be performed and to obtain specific prior authorization from the consumer for any work that exceeds $100. 815 ILCS 306/15 (West 2016). Pursuant to the Repair Act, an "[a]utomotive repair facility" or "a motor vehicle repair facility" is defined as "any person, firm, association, or corporation that for compensation engages in the business of automotive repair or diagnosis, or

9

both, of malfunctions of motor vehicles." *Id.* § 10. In the context of the present case, an "[a]utomotive repair" includes, but is not limited to:

> "All repairs to motor vehicles that are commonly performed in a motor vehicle repair facility by a motor vehicle technician, including the diagnosis, installation, exchange, or repair of mechanical or electrical parts or units for any vehicle, the performance of any electrical or mechanical adjustment to any vehicle, or the performance of any service work required for routine maintenance or repair of any vehicle. The term does not include commercial fleet repair or maintenance transactions involving 2 or more vehicles or ongoing service or maintenance contracts involving vehicles used primarily for business purposes." *Id.* § 10(1).

¶ 15    A consumer may waive the right to receive a written estimate if he or she does so voluntarily and without being coerced by the motor vehicle repair facility. *Id.* § 45. Section 20 of the Repair Act provides a specific form that is to be used for any such waiver. See *Id.* § 20. A knowing violation of the Repair Act constitutes an unlawful practice and is actionable under the Consumer Fraud Act. 815 ILCS 505/2Z (West 2016).

¶ 16    In the present case, after having reviewed the facts, the statutes at issue, and the case law, we conclude that the trial court's finding—that defendant had violated the Repair Act and the Consumer Fraud Act in his repair of Lloyd's vehicle—was well supported by the evidence. Contrary to defendant's assertions, we find that the statutory language of section 10(1) of the Repair Act is clear and unambiguous. For our purposes here, the section establishes two exceptions to the estimate and authorization requirements (two categories of repairs that are not classified as "[a]utomotive repair" for the purposes of the Repair Act): (1) commercial fleet repair or maintenance transactions involving two or more vehicles and (2) ongoing service or

10

maintenance contracts involving vehicles used primarily for business purposes. See 815 ILCS 306/10(1) (West 2016). Neither of those two exceptions is present in the instant case, where there was only one vehicle involved and where there was no ongoing service or maintenance contract between the parties. See *id.* Defendant's assertions to the contrary are unpersuasive, as defendant relies upon a strained reading of the statute to suggest that more exceptions exist and improperly attempts to group Lloyd's vehicle together with other vehicles from Cedar Rapids to fit the repair work into one of defendant's claimed statutory exceptions.

¶ 17 Based upon our reading of section 10(1), however, we conclude that the Repair Act applied to defendant in this case. See *id.* Defendant, therefore, was required to provide Lloyd with a written estimate prior to the work being performed and to obtain Lloyd's prior authorization for the completion of the work. See *id.* § 15. Lloyd could not have validly waived those requirements because a valid waiver form, as required by section 20 of the Repair Act, was never signed by Lloyd. See *id.* § 20.

¶ 18 Finally, despite defendant's claim to the contrary, the evidence in this case was sufficient to show that defendant knowingly violated the Repair Act as necessary to establish an actionable violation under the Consumer Fraud Act. See 815 ILCS 505/2Z (West 2016). This is not a case where defendant inadvertently failed to provide an estimate. Rather, defendant knowingly and intentionally elected not to provide an estimate because he was "too busy" and never sought to obtain a written waiver from Lloyd for the estimate requirement. Instead, defendant chose to rely on his erroneous belief that the work was not covered by the Repair Act and did over $9000 worth of work on Lloyd's truck without giving Lloyd an estimate and without obtaining prior authorization from Lloyd. However, the problem with defendant's reliance in that regard, as plaintiffs correctly note, is that it is contrary to the fundamental legal principle that a person's

11

lack of knowledge or mistake about the law is generally not a defense to a violation of the law. See *Jones v. Board of Education of the City of Chicago*, 2013 IL App (1st) 122437, ¶ 22 (stating that "it has long been the law that everyone is presumed to know the law and ignorance of the law excuses no one"); *Baker*, 677 F.2d at 779; *Rutyna*, 478 F. Supp. at 982; *Turner*, 211 F. Supp. 2d at 1109. Furthermore, to the extent that case law decisions in other contexts state or suggest that a defendant must know the underlying statute and specifically intend to violate it to satisfy the Consumer Fraud Act's "knowing" requirement, we disagree with those decisions. *Contra Kunkel*, 387 Ill. App. 3d at 1159-60; *Wendorf*, 755 F. Supp. 2d at 978.

¶ 19                                    CONCLUSION

¶ 20        For the foregoing reasons, we affirm the judgment of the circuit court of Tazewell County.

¶ 21        Affirmed.

¶ 22        JUSTICE HOLDRIDGE, dissenting.

¶ 23        I dissent. In my view, the trial court erred in granting judgment for the Bells because the Bells failed to demonstrate that Ring "knowingly" violated the Repair Act (815 ILCS 306/15 (West 2016) and therefore failed to establish an actionable violation of the Consumer Fraud Act (815 ILCS 505/2Z (West 2016). Because the Repair Act does not provide a private right of action for parties harmed by an automotive repair facility's violation of the Repair Act, the Bells' claim can succeed only if the Bells can show that Ring violated the Consumer Fraud Act. Section 2Z of the Consumer Fraud Act provides that any person who "knowingly" violates the Repair Act (or several other statutes) "commits an unlawful practice within the meaning of [the Consumer Fraud Act]." 815 ILCS 505/2Z (West 2016). Courts interpreting section 2Z, including our appellate court, have held or suggested that a party commits a "knowing" violation sufficient

12

to support a claim under the Consumer Fraud Act only when the underlying statutory violation was committed "with the intent to disregard the law." *Wendorf v. Landers*, 755 F. Supp. 2d 972, 978 (N.D. Ill. 2010); see also *Kunkel v. P.K. Dependable Construction*, *LLC*, 387 Ill. App. 3d 1153, 1160 (2009) (holding that violation of Home Repair and Remodeling Act (815 ILCS 513/20(a) (West 2002)) did not violate section 2Z of the Consumer Fraud Act because plaintiff failed to provide either evidence of defendant's state of mind or evidence supporting a knowing violation).

¶ 24        The majority acknowledges these decisions but declines to follow them. *Supra* ¶ 18. According to the majority, Ring "knowingly" violated the Repair Act by intentionally failing to provide the Bells with an estimate of the repairs at issue, even if (as Ring claims) Ring did not know the Repair Act required him to provide an estimate. I disagree. Section 2Z of the Consumer Fraud Act provides a private right of action only against parties that "knowingly violate" the Repair Act. On the majority's view, unintentional violations of the Repair Act would be actionable under the Consumer Fraud Act so long as the conduct at issue (here, the failure to provide an estimate) was performed intentionally. But that would render the Consumer Fraud Act's explicit requirement of a *knowing violation* meaningless and superfluous. *Wendorf*, 755 F. Supp. 2d at 978. We should avoid construing the statute in this manner. See *Merritt v. Department of State Police*, 2016 IL App (4th) 150661, ¶ 20 (a reviewing court should avoid an interpretation that renders one of a statute's provisions superfluous). Such an interpretation would seem particularly inappropriate here because the legislature declined to provide a private right of action in the Repair Act and expressly conditioned the availability of a remedy under the Consumer Fraud Act upon proof that the defendant "knowingly violate[d]" the Repair Act. Accordingly, I find *Kunkel* and *Wendorf* to be well reasoned, and I would follow them here.

13